## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNIVERSAL MEDICAL, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** _____ |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **LANX, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Universal Medical, LLC, for its Complaint against Defendant Lanx, Inc., states as follows:

## INTRODUCTION

1.       This cause of action seeks damages against Lanx, Inc. for its actions and misrepresentations in connection with engaging Universal Medical, LLC, as a distributor for its products and using the promise of an exclusive, long-term distribution agreement to use and take over Universal Medical, LLC's relationships with certain medical providers and distributors without just compensation.

## PARTIES

2.       Plaintiff Universal Medical, LLC ("Universal Medical") is a Tennessee corporation that represents multiple healthcare product lines through a nationwide network of independent medical sales representatives and distributors.  Its principal place of business is located at 750 Old Hickory Boulevard, Brentwood, Davidson County, Tennessee, 37027.

3.     Defendant Lanx, Inc. ("Lanx") is a Delaware corporation with its principal place of business in Colorado. Lanx designs and develops certain medical devices focused on spinal products. Lanx may be served with process through its registered agent, Stephen M. Deitsch at 310 Interlocken Parkway, Suite 120, Broomfield, Colorado, 80021. Lanx is not registered to do business in Tennessee but conducts business in Tennessee.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to the United States Constitution art. 3, sec. 2, and 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between the Plaintiff and the Defendant, and the amount in controversy is in excess of $75,000.00.

5.     Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391 because this action involves negotiations, business transactions, actions and representations of Defendant in this District and the gravamen of the harm to Plaintiff occurred in this District.

## FACTUAL BACKGROUND

### Lanx Represents that Universal Medical Will Be the Exclusive, Long-Term Distributor in Kentucky and Most of Tennessee

6.     In or about December 2011, Universal Medical and Lanx began discussions regarding Universal Medical acting as a distributor for Lanx.

7.     On or about December 6, 2011, Nick Ansari, Executive Vice President of Sales for Lanx, met at Universal Medical's offices in Brentwood, Tennessee to discuss the distributor relationship with Ryan Cain, President of Universal Medical, and Jeff Wertz, Sales Manager of Universal Medical.

8.     The focus of Lanx's discussions at the December 6, 2011 meeting was Universal Medical's relationships with spine surgeons who could be introduced to Lanx and used for input, feedback and involvement with Lanx. In particular, Lanx was looking for specific, high-profile

2

surgeons who perform high volume procedures and might be open to switching to Lanx for their medical devices. Mr. Ansari stated that Lanx had a revenue growth target for 2012 for the United States of approximately $20 million. Messrs. Cain and Wertz suggested that Universal Medical had existing relationships with certain surgeons who, if they switched to Lanx, likely could deliver up to twenty-five percent (25%) of Lanx's growth target.

9. On or about January 19, 2012, at the request of Mr. Ansari, Frank DeStefano, Lanx's new Area Sales Director, flew to Nashville and met with Universal Medical for further discussions on surgeon targets and geographical territory coverage.

10. Mr. DeStefano asked whether Universal Medical wished to be an exclusive distributor for Lanx in spine products and emphasized the benefits of being an exclusive distributor, including receiving 30% commission on all sales (and up to 40% commission under some incentive plans) and enjoying a long-term distributor relationship with Lanx.

11. Mr. DeStafano also stated to Messrs. Cain and Wertz that it was Lanx's business plan and intention going forward to move from non-exclusive distributor agreements to exclusive distributor agreements.

12. In reliance on Lanx's representations of the benefits of being an exclusive distributor and Lanx's plan to make Universal Medical an exclusive, long-term distributor, Mr. Cain told Mr. DeStefano that Universal Medical would agree to be an exclusive distributor for Lanx on a long-term basis.

13. Mr. DeStefano, on behalf of Lanx, stated that Lanx would make Universal Medical its exclusive, long-term distributor in the entire Commonwealth of Kentucky and all of the State of Tennessee except for Jackson and West Memphis.

3

14. In order to do so, Mr. DeStefano explained that Lanx would need to terminate approximately five or six non-exclusive distributor agreements in place at the time in Kentucky and Tennessee markets. Mr. DeStefano explained that he was already in the process of terminating these non-exclusive distributors pursuant to Lanx's stated plan to switch to exclusive distributor arrangements. Mr. DeStefano stated that he would need thirty to ninety days to complete that process before making Universal Medical the exclusive distributor for all of Kentucky and all of Tennessee except for Jackson and West Memphis.

15. Effective January 30, 2012, Lanx and Universal Medical entered into a Distribution Agreement whereby Universal Medical became a distributor for Lanx medical devices (the "Distribution Agreement").

16. As a result of the representations of Mr. DeStefano regarding the need to terminate other non-exclusive distributor agreements first, the Distribution Agreement did not reflect the exclusive, long-term distributor arrangement discussed by Lanx and Universal Medical.

17. Notwithstanding the terms of the Distribution Agreement, Mr. DeStefano represented after its execution that until the other non-exclusive distributor agreements were terminated, Lanx pro-actively would treat Universal Medical as an exclusive distributor and that Universal Medical would be awarded all of the benefits of an exclusive distributor, including the right to be paid at a thirty percent (30%) commission rate on base sales and a forty percent (40%) commission rate for sales of promotional products and contests that Lanx awarded under its "Aspen Bounty Hunter Program 2."

18. Universal Medical executed the Distribution Agreement and continued to act as a distributor for Lanx after execution of the Distribution Agreement in reliance on the

4

representations of Mr. DeStefano, on behalf of Lanx, that Universal Medical was to be the exclusive, long-term distributor for Lanx in Kentucky and most of Tennessee.

19.     The Distribution Agreement was represented by Lanx and considered by Universal Medical to be a temporary agreement that would be amended or replaced to make Universal Medical the exclusive distributor for Lanx in the entire Commonwealth of Kentucky (including, notably, Paducah) and all of the State of Tennessee except West Memphis and Jackson.

20.     In reliance on the representations of Lanx that Universal Medical would be the exclusive, long-term distributor of Lanx products in Kentucky and most of Tennessee, on March 9, 2012, Universal Medical terminated its existing agreement to distribute spine-related medical products for Integra Life Sciences (which had acquired SeaSpine, Inc. in 2011).  Universal Medical terminated this business relationship because Lanx indicated that Universal Medical could not be the exclusive distributor for Lanx products in the area if it also distributed a competitor's products.

21.     Mr. Ansari and Mr. DeStefano invited Mr. Wertz to attend the Lanx National Sales Meeting to be held in February 2012 as a representative of Universal Medical, the new exclusive distributor for Lanx in Kentucky and most of Tennessee.

22.     From the outset of the relationship, Lanx paid Universal Medical 30% commissions as represented to be the commissions paid only to exclusive distributors.

23.     In June 2012 (effective April 3, 2012), Lanx and Universal Medical executed the First Amendment to the Distribution Agreement, which gave additional territories (including Paducah, Kentucky) to Universal Medical.

5

24.     According to Lanx, this First Amendment was entered into because the prior non-exclusive distributor agreements covering these territories had been terminated, but other territories promised to Universal Medical were not yet available and would be added pursuant to future amendments when available. Further, Lanx continued to represent that, once all of the territories were available, Lanx would make Universal Medical the exclusive, long-term distributor in Kentucky and most of Tennessee.

25.     The payment of commissions at exclusive distributor rates and the amendment to include the Paducah, Kentucky territory were consistent with Lanx's representations that it intended to and was working toward making Universal Medical the exclusive, long-term distributor for Lanx products in Kentucky and most of Tennessee.

26.     As set forth below, it was not until August 2012 that Lanx – having used Universal Medical to set up Lanx to receive huge financial benefits for years to come – informed Universal Medical that it was <u>removing</u> Paducah, Kentucky from Universal Medical's territories and would <u>not</u> make Universal Medical the exclusive, long-term distributor in Kentucky and Tennessee as repeatedly promised.

### Universal Medical Works to Convert, Among Others, Drs. Strenge and Hill in Paducah, Kentucky

27.     Prior to December 2011, Universal Medical had developed an ongoing business relationship with many medical providers, including Dr. Brandon Strenge and Dr. Clint Hill in Paducah, Kentucky. Universal Medical also had an ongoing business relationship with Western Baptist Hospital and Lourdes Hospital in Paducah, Kentucky – the hospitals at which Drs. Strenge and Hill performed many procedures.

6

28.    Luke Crider, Universal Medical's spinal sales representative for the areas of Western Kentucky, had knowledge of the spine practice of Drs. Strenge and Hill through his prior work.  Drs. Strenge and Hill were at the time using NuVasive spinal medical devices.

29.    After Mr. Ansari met with Universal Medical in Nashville on or about December 6, 2011, Universal Medical mentioned Drs. Strenge and Hill as fitting Lanx's stated goal of targeting specific, high-profile surgeons who perform high-volume procedures and might be looking to switch to Lanx for their medical devices.

30.    When Universal Medical mentioned Drs. Strenge and Hill, Mr. Ansari had no idea who they were and could not even find Paducah, Kentucky on a map.

31.    When Mr. DeStefano met with Universal Medical on or about January 19, 2012 to discuss a potential distributor relationship, Drs. Strenge and Hill were discussed in detail.

32.    Messrs. Cain and Wertz suggested that, through Universal Medical's efforts and relationships, they could seek to convert Drs. Strenge and Hill to Lanx products and that those two surgeons alone potentially could bring in roughly 25% of Lanx's targeted U.S. dollar growth of $20 million.

33.    In reliance on the representations of Mr. DeStefano and Lanx, on or about January 23, 2012, Luke Crider and Jeff Wertz of Universal Medical met with Dr. Hill at the Orthopedics Institute of Western Kentucky.

34.    In addition to Lanx products, Messrs. Crider and Wertz discussed with Dr. Hill the Ovation biologic products.  Ovation is biologic medical product manufactured by Osiris Therapeutics, Inc. that is distributed primarily by a company called Stability Biologics ("Stability").  On or about September 1, 2011, Universal Medical and Stability had entered into a sales representation agreement pursuant to which Universal Medical acted as a sales

7

representative of Ovation and other products with respect to certain health care providers (as opposed to geographic territories), including Drs. Strenge and Hill. Ovation biologic products work as a complement to the products offered by Lanx in spine surgeries.

35. At this January 23, 2012 meeting, Dr. Hill agreed to speak on the telephone with Dr. Andrew Cappuccino to discuss Ovation biologics and Lanx products. Dr. Cappuccino is a spine surgeon with Buffalo Spine Surgery in New York and is the chairman of the Surgeon Advisory Board for Lanx.

36. On or about February 16-18, 2012, Mr. Wertz, on behalf of Universal Medical, attended the Lanx 2012 National Sales Meeting in Snowmass, Colorado, at which meeting he met with Mr. Ansari, Mr. DeStefano, Craig Barrett (Lanx's Director of Surgeon Relations and Professional Affairs), Troy Wooley and Dr. Cappuccino, among others.

37. Mr. Wertz was invited to the Lanx 2012 National Sales Meeting and was introduced at this meeting as the representative of Universal Medical, who was described as the new exclusive distributor for Lanx in Kentucky and most of Tennessee and the entity responsible for working with Drs. Strenge and Hill.

38. Lanx provided all food, meals and lodging for Mr. Wertz at the Lanx 2012 National Sales Meeting at no charge, which was consistent with the Lanx contractual arrangements for exclusive distributors attending the meeting.

39. At the 2012 National Sales Meeting, Messrs. Ansari and DeStefano asked Universal Medical to invite Drs. Strenge and Hill to attend a Lanx surgeon training program that would focus on lateral (as opposed to anterior or posterior) procedures and products.

40. In connection with this request, Universal Medical was asked to fill out a Healthcare Professional Consultant Nomination Form, which Mr. Crider submitted, that would

8

allow Drs. Strenge and Hill to be nominated to become consultants for Lanx by the Lanx Executive Board.

41.    Mr. DeStefano and Lanx acknowledged to Universal Medical that Universal Medical, and not Lanx or Lanx's prior distributor in the territory, had the relationships to access Drs. Strenge and Hill and speak to them about converting to Lanx products.

42.    On or about February 29, 2012, Messrs. Crider and Wertz met with Dr. Strenge to continue discussions of Lanx products.

43.    In or about March 2012, Messrs. Crider and Wertz continued Universal Medical's sales pitch to Drs. Strenge and Hill, including arranging for multiple meetings and discussing on multiple occasions the clinical benefits and advantages of Lanx products, in particular the Timberline lateral retractor system.   No direct Lanx representatives were ever in Paducah, Kentucky to show Lanx products in January, February or March 2012.

44.    At the request of Lanx, Universal Medical arranged for Drs. Strenge and Hill to fill out the necessary paperwork to attend a Lanx lateral educational spine course.

45.    During conversations with Universal Medical's agents, Messrs. Crider and Wertz, Dr. Strenge acknowledged certain shortcomings to the devices that he was using and expressed an interest in considering Lanx's options.

46.    On or about April 4, 2012, Mr. Crider on behalf of Universal Medical met with Keith Bartlett, Operating Room Business Manager of Western Baptist Hospital, to begin the approval process for allowing Lanx spinal implants at Western Baptist Hospital. No Lanx direct representatives were in attendance at this meeting or other presentations in Paducah, Kentucky in January, February or March 20012 at Drs. Strenge and Hill's clinic.

9

47. On or about April 5, 2012, Mr. Crider sent all contract paperwork to Lanx for approval on Premier Tier 4 pricing with Western Baptist Hospital, which would allow Drs. Strenge and Hill access to utilize Lanx implants at the hospital.

48. On or about April 8, 2012, Dr. Strenge sent an email to Mr. Crider expressing reservations on behalf of himself and Dr. Hill about utilizing the Lanx Timberline System.

49. On or about April 18-20, 2012, Messrs. Crider and Wertz attended the Current Solutions in Spine Surgery ("CSSS") Spine meeting in Duck Key, Florida to meet, discuss, and address Dr. Strenge's questions related to Lanx products. Mr. Wertz spent approximately three hours with Dr. Strenge and his wife at the opening reception, building personal relationships and convincing Dr. Strenge to discuss Lanx products further. No direct representative of Lanx was present in these discussions.

50. During one morning of the CSSS meeting, Messrs. Crider and Wertz acted as Lanx representatives and worked the Lanx booth. During their time at the Lanx booth, Dr. Strenge visited and Messrs. Crider and Wertz were able to provide product demonstrations of Lanx spinal device Durango (ALIF or anterior lumbar interbody fusion) and to discuss a cervical stand-alone "ALTA" device with Dr. Strenge. No direct representative of Lanx was present in these discussions because the two Lanx representatives at the CSSS meeting, Ryan Fredricey and Lindsey Winnings, had both taken off the morning session from working the Lanx booth.

51. After the product demonstrations, Dr. Strenge reinforced his interest in Lanx and agreed to meet with Lanx executives in Paducah, Kentucky.

52. On or about May 23, 2012, Universal Medical arranged a dinner with Drs. Strenge and Hill to meet Lanx executives for the first time along with Universal Medical

10

representatives. Prior to this meeting, Universal Medical was the sole agent of Lanx promoting Lanx products to Drs. Strenge and Hill.

53. At the dinner, Messrs. Crider and Wertz introduced Drs. Strenge and Hill to Lanx executives Mr. Barrett, Mr. DeStefano and James Green, Regional Vice President-East of Lanx. At this time, Lanx offered to make Drs. Strenge and Hill consultants and involve them in a TLIF (transforaminal lumbar interbody fusion) project in which the surgeons would be able to receive royalties on the products/projects of Lanx with which they were involved.

54. After the dinner, Dr. Hill invited Universal Medical and Lanx representatives for a tour of the facilities at their Orthopedics Institute.

55. On or about May 29, 2012, at the request of Lanx, Mr. Crider again met with Dr. Strenge to discuss the TLIF project further.

56. On or about June 4, 2012, Mr. Barrett contacted Mr. Crider and asked him to meet with Drs. Strenge and Hill to further discussions about the TLIF project. Another lunch meeting was arranged, at which meeting Messrs. Crider and Wertz brought the complete Lanx set of Timberline implants and instrumentation into Dr. Hill's clinic for review.

57. After this meeting, Dr. Hill made a verbal commitment to evaluate the Durango and Timberline products of Lanx and confirmed his desire to be involved in a TLIF study with Lanx.

58. In or around June 2012, after Lanx proposed royalty rights on the TLIF project to Dr. Hill, Dr. Hill made a verbal commitment to evaluate Lanx products at Western Baptist Hospital and to attend a Lanx VIP meeting with Universal Medical in July or August.

11

59.     Also in or around June 2012, Universal Medical worked on behalf of Lanx to have all Lanx products approved at Western Baptist Hospital in Paducah, Kentucky, the hospital at which Drs. Strenge and Hill perform many procedures.

60.     After over four months of hard work by Universal Medical to negotiate a price with Western Baptist Hospital, Lanx approved the pricing submitted by Universal Medical for Western Baptist Hospital. There was never a single visit by any Lanx direct representative with the Hospital to assist in these negotiations.

61.     Pursuant to Lanx's approved contract status with Western Baptist Hospital negotiated by Universal Medical, Lanx expected to receive approximately $5 to $6 million per year for seven (7) years (for a total of $35 to $42 million). At the agreed-upon 30% commission rate (with 40% on select products involving Aspen), Universal Medical would receive $10 to $13 million in commissions over the course of the seven-year deal based on its work with Drs. Strenge and Hill and Western Baptist Hospital.

62.     Upon information and belief, Lanx expected to receive revenue of approximately $1 million a year from procedures at Lourdes Hospital, the other hospital at which Drs. Strenge and Hill perform procedures. Universal Medical would have received significant commissions over the course of this relationship based on its work with Drs. Strenge and Hill and Lourdes Hospital.

63.     In or around June 2012, Drs. Strenge and Hill were offered consultant contracts and paperwork to be involved in a TLIF project that, upon information and belief, would last for seven (7) years. Drs. Strenge and Hill were offered by Lanx to become proctors/teachers for Lanx so that they could educate, train and teach other physicians on the Timberline product.

12

64. After Drs. Strenge and Hill failed quickly to execute the paperwork regarding the TLIF project, Mr. DeStefano repeatedly requested that Universal Medical follow-up with Drs. Strenge and Hill.

**Lanx Reveals Its Ultimate Goal to Cut Universal Medical Out of the Relationship**

65. In or around July 2012, Mr. DeStefano reached out to Tommy Plummer, a sales representative for NuVasive who had worked with Drs. Strenge and Hill in their use of NuVasive products.

66. When Mr. DeStefano informed Universal Medical of this conversation with Mr. Plummer, Universal Medical assumed that any deal with Mr. Plummer would be consistent with the promised relationship between Lanx and Universal Medical, such as Mr. Plummer joining Universal Medical as a sales representative. Mr. DeStefano did not indicate otherwise at this time.

67. Upon information and belief, Mr. DeStefano met with Mr. Plummer in July 2012 and afterward discussed hiring him away from NuVasive.

68. At around the same time, Mr. DeStefano informed Universal Medical merely that Lanx was reviewing non-competition issues with Mr. Plummer.

69. In or around August 2012, Lanx enticed Mr. Plummer away from NuVasive and hired him directly as a regional specialist in the Kentucky and Tennessee markets.

70. On or about August 13, 2012, Mr. DeStefano informed Mr. Wertz that Drs. Strenge and Hill had signed their consultancy contracts and that Lanx had hired Mr. Plummer to sit out his one-year non-competition agreement with NuVasive, after which time Mr. Plummer would become the Lanx distributor for Paducah, Kentucky, as well as Memphis and Jackson Tennessee.

13

71.     Upon information and belief, Mr. Plummer will be paid approximately $700,000 a year under his arrangement with Lanx.

72.     Mr. DeStafano also informed Mr. Wertz that Lanx had hired two additional former NuVasive sales representatives as direct Lanx employees to cover cases for Drs. Strenge and Hill and the Paducah, Kentucky territory while Mr. Plummer sat out the time of his non-competition agreement with NuVasive.  Mr. DeStafano stated that Lanx would pay each of these two additional sales representatives a compensation package between $150,000 and $160,000 each for the first year.

73.     Finally, in this August 13, 2012 conversation, Mr. DeStafano informed Mr. Wertz that Universal Medical would no longer have distribution rights in Paducah, Kentucky going forward.

74.     This August 13, 2012, conversation was the first time Universal Medical realized that Lanx had established a direct line of communication with Drs. Strenge and Hill regarding their Lanx contracts.  Lanx had used Universal Medical's and Mr. Crider's long orthopedic relationships with Drs. Strenge and Hill and eight (8) months of hard work by Universal Medical to get their foot in the door and promote Lanx products, and now Lanx was completely cutting Universal Medical out of the financial rewards of this work.

75.     Lanx, therefore, went back on its prior, repeated representations that Universal Medical would be the exclusive, long-term distributor for Lanx products in Paducah, Kentucky. Universal Medical had reasonably relied on these representations in working for months to convert Drs. Strenge and Hill to Lanx products and had expected to receive millions of dollars in commissions over the seven-year term of the Lanx deals.

14

76.     During the August 13, 2012 conversation, Mr. Wertz asked Mr. DeStefano why Lanx did not approach Universal Medical about hiring the local representatives so that Universal Medical could keep the Paducah territory as promised. Mr. Destafano responded that he did not think that Universal Medical could afford to hire these representatives, although that explanation does not make sense given the anticipated commissions that Universal Medical would earn under the promised exclusive distributorship arrangement with Lanx.

77.     In follow-up conversations between Universal Medical and Lanx, Mr. DeStefano repeatedly stated that Universal Medical "did nothing wrong" to lose the territory but that "it just is what it is."

78.     Up until August 13, 2012, Universal Medical had been working on multiple other opportunities for Lanx and Universal Medical, including but not limited to: Dr. Mark Crawford in Paducah, Kentucky; Dr. Clark Bernard in Ashland, Kentucky; and medical providers in Louisville, Kentucky; Evansville, Indiana; and Bristol, Tennessee.

79.     With respect to Dr. Bernard, with whom Universal Medical had a prior business relationship, Mr. DeStefano contacted Dr. Bernard on February 3, 2012 and informed him that the Lanx's business strategy was to have full-line, exclusive distributors and that Lanx had decided to commit to using Universal Medical for the entire states of Kentucky and Tennessee, with plans to expand beyond those territories.

80.     Based on Mr. DeStefano's representations and Universal Medical's work and promotion of Lanx, Dr. Bernard was successful in gaining approval for Lanx products at King's Daughters Hospital, where he performs many surgeries.

81.     Universal Medical expected to receive significant commissions based upon the use of Lanx products by Dr. Bernard and King's Daughters Hospital.

15

82.     On August 21, 2012, Lanx sent a letter to Universal Medical providing formal notice of termination of the distributor relationship between Lanx and Universal Medical, effective October 3, 2012.

83.     Upon information and belief, Lanx orchestrated a scheme used repeatedly by Lanx whereby Lanx directly hires sales representatives from competitors rather than enter into long-term, exclusive distribution agreements with companies such as Universal Medical.   In order to effectuate this scheme, Lanx promises long-term, exclusive distributor agreements with no intention of following through.   Upon information and belief, Lanx refers to this as the "Buffalo Plan" because of the involvement of Dr. Cappuccino (who practices in Buffalo, New York).  Universal Medical is merely the latest victim.

84.     Lanx purposefully kept Universal Medical in the dark about Lanx's plans so it could continue using Universal Medical's business relationships and work for the sole benefit of Lanx.

85.     Upon information and belief, Dr. Cappuccino discussed with Dr. Hill the strategy of Lanx directly hiring Mr. Plummer for the Paducah, Kentucky territory – rather than give the territory on a long-term basis to Universal Medical as promised.

86.     Upon information and belief, and as part of Lanx's scheme, Dr. Cappuccino also contacted Brian Martin at Stability.  Dr. Cappuccino, on behalf of Lanx, demanded that Stability cease using Universal Medical to distribute Ovation products to Drs. Strenge and Hill and remove those physicians from the contract between Universal Medical and Stability.  Instead, Dr. Cappuccino demanded that Ovation use Lanx to distribute Ovation products to Drs. Strenge and Hill.  If Stability did not agree, then Lanx would cease promoting the use of Ovation products in connection with Lanx products in spine surgeries.

16

87.     Based on the demands of Lanx and Dr. Cappuccino, Stability removed Drs. Strenge and Hill from Universal Medical's contract.  Thereafter, Lanx benefited financially from Ovation products used by Drs. Strenge and Hill and Western Baptist and Lourdes Hospitals.

88.     Based on the work of Universal Medical, Lanx created a business relationship with Dr. Strenge, Dr. Hill, Western Baptist Hospital, Lourdes Hospital and other medical providers.  That relationship will garner millions of dollars in revenue for Lanx and it would never have existed but for Universal Medical.

89.     Universal Medical performed over eight (8) months of work and spent tens of thousands of dollars and resources (including time, manpower and travel expenses) to bring Dr. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital to Lanx in reliance on the promised distributor relationship and representations of Lanx that Universal Medical would be the exclusive, long-term distributor for the Paducah, Kentucky territory, among others.

90.     Despite Lanx's repeated representations to the contrary, Lanx never had any intention of maintaining a long-term distributor relationship with Universal Medical or making them the exclusive distributor for areas including Paducah, Kentucky.

91.     Lanx used Universal Medical and its pre-existing relationships with Drs. Strenge, Hill and others to usurp the business of Universal Medical and then hire alternate representatives to enjoy the financial benefits of the newly-acquired relationships with Drs. Strenge, Hill and others.

**Lanx Attempts to Hire Mr. Crider from Universal Medical**

92.     On or about September 10, 2012, Mr. DeStefano and Blake Hammond, a new direct sales representative of Lanx, had dinner with Mr. Crider at Outback Steakhouse in Paducah, Kentucky.  At this dinner, Mr. DeStafano told Mr. Crider that he felt bad about all of the work Mr. Crider had performed for Lanx for which he now had nothing to show.

17

93.     Mr. DeStefano then offered for Mr. Crider to become a product specialist-nationwide for Lanx.  After Mr. Crider expressed reservations about a job requiring a lot of travelling, Mr. DeStefano followed up, after a discussion with Mr. Plummer and Dr. Strenge, to offer that Mr. Crider could eventually join Mr. Plummer as a direct representative in the Kentucky and Tennessee markets.  Mr. DeStefano offered Mr. Crider a $40,000 base salary plus three percent (3%) on all sales in Paducah, Kentucky, representing that such an offer would likely amount to $180,000 to $200,000 a year.

94.     On September 12, 2012, Jill DeCino, Talent Manager for Lanx, called Mr. Crider to follow-up on Mr. DeStefano's employment offer and sent him the appropriate applications.

95.     These actions by Lanx were inconsistent with Mr. DeStefano's representations at the time Lanx took the Paducah, Kentucky market away from Universal Medical that Lanx's decision was based on statements from Drs. Strenge and Hill that they did not want to work with Mr. Crider.

96.     Mr. Crider never submitted the applications and declined Lanx's offer.

### Damages to Universal Medical

97.     As a result of Lanx's actions, Universal Medical has lost millions of dollars in commissions that will be earned in the territories and from the medical providers that Universal Medical brought to Lanx.

98.     In addition to expected commissions from Lanx, Universal Medical lost its relationships with and the ability to sell competitor products to Drs. Strenge, Hill, Bernard and others in several territories.  As a practical matter, Universal Medical cannot go back to these doctors shortly after spending almost a year convincing them to switch to Lanx products and try to convince them to switch away from Lanx.  Lanx was aware of this fact.

18

99.     Through the actions of Dr. Cappuccino contacting Mr. Martin at Stability, Inc., Universal Medical also lost its distribution rights for the Ovation product and the accompanying commissions it could have earned.  The end result was that Universal Medical lost commissions not only for medical devices but also for biologics for the Paducah, Kentucky and other territories.

## CAUSES OF ACTION

### Count One:  Fraudulent Misrepresentation/Fraud

100.    Universal Medical incorporates by reference the allegations contained in the paragraphs above.

101.    Lanx represented to Universal Medical that Universal Medical would be the exclusive, long-term distributor of Lanx products in the entire Commonwealth of Kentucky and the entire State of Tennessee except Jackson and West Memphis.

102.    Lanx represented to Universal Medical that, as an exclusive distributor, Universal Medical would be entitled to at least 30% in commissions for Lanx products in these territories and 40% in commissions under the Lanx Aspen Bounty Hunter Program 2 (under which Drs. Strenge and Hill were deemed top targets of Lanx by Messrs. Ansari and DeStefano), as well as the security of a long-term relationship.

103.    These representations were specifically made on multiple occasions, including without limitation (a) by Nick Ansari, Executive Vice President of Sales for Lanx, on December 6, 2011 at Universal Medical's offices in Brentwood, Tennessee; and (b) by Frank DeStefano, Area Sales Director for Lanx, on or about January 19, 2012 at Universal Medical's offices in Brentwood, Tennessee.

19

104. Lanx intentionally made these representations to Universal Medical in order to induce Universal Medical to begin work immediately promoting Lanx products in these territories.

105. Lanx intentionally made these representations to Universal Medical in order to use Universal Medical's existing relationships with medical providers to convert them to Lanx products for the financial benefit of Lanx.

106. Once Lanx learned of the potential volume of business with Drs. Strenge and Hill and Western Baptist Hospital, it reiterated its promise to make Universal Medical the exclusive, long-term distributor in the promised territories, including specifically Paducah, Kentucky.

107. At the time Lanx made these representations, it knew that they were false, that Lanx had no present intention to carry out its promises, and that Lanx sought only to use Universal Medical to gain access to medical providers and territories without any intention of making Universal Medical the exclusive, long-term distributor for the promised territories.

108. These fraudulent misrepresentations were material and determined the conduct of Universal Medical in promoting Lanx products and seeking to convert, among others, Dr. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital to Lanx products.

109. Universal Medical reasonably relied on these fraudulent misrepresentations to spend almost a year meeting with Drs. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital, among others, to convince them to convert to Lanx products.

110. Universal Medical reasonably relied on these fraudulent misrepresentations to terminate its existing relationship as a distributor for Integra/SeaSpine products so that it could become the exclusive, long-term distributor for Lanx, thereby foregoing commissions that could have been earned on Integra/SeaSpine products.

20

111.   Lanx's fraudulent misrepresentations directly and proximately caused Universal Medical significant damages in an amount to be proven at trial.

112.   Lanx is liable to Universal Medical for these damages.

113.   Lanx has repeatedly engaged in similar schemes in other territories and hidden its scheme from victims such as Universal Medical.

114.   Lanx's misrepresentations were made with fraud, malice, gross negligence and/or oppression.

115.   Lanx is liable for punitive damages to Universal Medical for its fraudulent misrepresentations.

### Count Two:  Unjust Enrichment

116.   Universal Medical incorporates by reference the allegations contained in the paragraphs above.

117.   Lanx was conferred a benefit by Universal Medical after Universal Medical used its pre-existing relationships with Drs. Strenge and Hill and other medical providers to promote Lanx products and convert them to using Lanx products.

118.   Lanx was conferred a benefit by Universal Medical after Universal Medical spent significant time, money and efforts convincing Drs. Strenge and Hill and other medical providers to convert to using Lanx products and to act as consultants for Lanx.

119.   Lanx appreciated these benefits conferred by Universal Medical and continues to benefit financially from the relationships gained by Lanx through Universal Medical.

120.   Universal Medical has not been compensated in accordance with the value of the benefits it conferred on Lanx, including but not limited to seven (7) years of commissions for Lanx products sold to Drs. Strenge and Hill and Western Baptist Hospital.

121.    It would be inequitable for Lanx to retain the benefits conferred by Universal Medical without payment to Universal Medical of the value of the benefits.

122.    Lanx, therefore, has been unjustly enriched and must make restitution to Universal Medical in an amount to be proven at trial.

**Count Three:  Intentional Interference with Business Relationships**

123.    Universal Medical incorporates by reference the allegations contained in the paragraphs above.

124.    Universal Medical had an existing business relationship with several medical providers, including Dr. Strenge, Dr. Hill, Dr. Bernard, Western Baptist Hospital and Lourdes Hospital, a relationship through which it distributed medical devices and products and received commissions from the manufacturers of the products.

125.    Universal Medical also had an existing business relationship with Stability through which it distributed Ovation products to, among others, Dr. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital.

126.    These business relationships had been forged through the efforts and work of Universal Medical that pre-existed any involvement by Lanx.

127.    During the course of its discussions with Universal Medical, Lanx became aware of the specific business relationship between Universal Medical and Drs. Strenge and Hill and the hospitals at which they performed procedures.

128.    The business relationship between Universal Medical and Drs. Strenge and Hill and their hospitals was one of the bases for Lanx continuing to promise Universal Medical an exclusive, long-term distributor relationship.

129.    After learning of the volume of business at stake, Lanx intended to use Universal Medical to gain access to Dr. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital

22

and then intended to interfere with these business relationships by contracting directly with these medical providers and using Lanx's own representatives to distribute Lanx products to them.

130. Lanx intended to and did interfere with the business relationships between Universal Medical and Dr. Strenge, Dr. Hill, Western Baptist Hospital and Lourdes Hospital by using Universal Medical's relationships to convert the medical providers and sign Drs. Strenge and Hill to consulting agreements, knowing that Universal Medical would then be prevented from seeking to convert these medical providers to another product after Lanx terminated its relationship with Universal Medical.

131. Lanx was aware of Universal Medical's business relationship with Stability and its role as distributing Ovation products to Drs. Strenge and Hill and their hospitals.

132. Lanx intended to and did interfere with the business relationship between Universal Medical and Stability by demanding that Stability remove Drs. Strenge and Hill from Universal Medical's sales list so that Lanx could profit from providing Drs. Strenge and Hill and their hospitals Ovation products itself.

133. Lanx's motive to interfere with and steal these business relationships from Universal Medical was improper, and the fraudulent means used by Lanx were improper.

134. Universal Medical was damaged by Lanx's tortious conduct in an amount to be proven at trial.

135. Lanx is liable to Universal Medical for these damages caused by its tortious conduct.

Universal Medical demands a jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Universal Medical, LLC respectfully requests and prays as follows:

23

A. That proper process issue and be served on Defendants and that they be required to appear and answer the Complaint within the time prescribed by law;

B. That Universal Medical receive a jury trial on all the issues so triable;

C. That the Court find that Lanx is liable for fraudulent misrepresentation;

D. That the Court find that Lanx is liable for unjust enrichment;

E. That the Court find that Lanx tortiously interfered with Universal Medical's business relationships;

F. That the Court award Universal Medical compensatory damages in an amount to be proven at trial;

G. That the Court award Universal Medical punitive damages in an amount to be proven at trial;

H. That the costs of this action be taxed to Defendants; and

I. That the Court award Plaintiff such other, further and general relief at law or in equity that the Court deems appropriate, including attorneys' fees and costs to the extent permitted by law.

Respectfully submitted,

John L. Farringer IV (No. 22783)
Ryan T. Holt (No. 30191)
SHERRARD & ROE, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
(615) 742-4200
(615) 742-4539 (facsimile)
jfarringer@sherrardroe.com
rholt@sherrardroe.com

*Attorneys for Universal Medical, LLC*

24